Paul Haimovitz et al. [1] v. Commissioner. Haimovitz v. Commissioner
Docket Nos. 15929-15931, 15937-15942, 30420, 30421, 30440-30442, 30444, 30446-30448, 30453-30455.
United States Tax Court
T.C. Memo 1956-15; 1956 Tax Ct. Memo LEXIS 279; 15 T.C.M. (CCH) 66; T.C.M. (RIA) 56015; January 20, 1956
E. O. Palermo, Esq., 1111 Wallace S. Building, Tampa, Fla., and H. H. Baskin, Jr., Esq., for the petitioners. Newman A. Townsend, Esq., and Hubert E. Kelly, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these proceedings, consolidated for hearing and consideration, respondent determined deficiencies and liabilities of the respective petitioners as follows: 1. The liability of Paul Haimovitz (Docket No. 15929), Ethel Haimovitz Krieger, (Docket No. 15930) and Florence Haimovitz *280 Rosenberg (Docket No. 15931) as transferees of the assets of the Estate of Lillian Haimovitz, deceased, as follows: Year
Liability
1939
$ 2,270.06
1940
7,306.22
1941
15,355.26
1943
44,659.66
Total
$69,591.20
2. The deficiencies in income taxes and penalties due from the Estate of Lillian Haimovitz, deceased (Docket No. 30453), and the liability of Ethel Hamovitz Krieger (Docket No. 30421), Florence Haimovitz Rosenberg (Docket No. 30441) and Paul Haimovitz (Docket No. 30447) as transferees of the assets of the Estate of Lillian Haimovitz, deceased, for such deficiencies as follows: Amount
of Deficiency
Taxable
Income
25% Delin-
Year
Tax
quency Penalty
1944
$ 6,945.09
$1,909.31
1945
3,169.11
1,139.81
1-1-46 to 2-18-46
22,623.85
5,655.96
Total
$32,738.05
$8,705.08
Paul Haimovitz (Docket No. 30447) also contests respondent's claim that he is liable, in amounts as set forth above, as fiduciary of the Estate of Lillian Haimovitz, deceased. 3. The liability of Paul Haimovitz (Docket No. 15937), Ethel Haimovitz Krieger (Docket No. 15938), Florence Haimovitz Rosenberg (Docket No. 15939), S. Herman Rosenberg (Docket No. *281 15940), Belmont Lumber Company, Inc. (Docket No. 15941) and Haimovitz Realty Corporation (Docket No. 15942) as transferees of the assets of the Estate of Ben Haimovitz, deceased, as follows: Amount of Liability
Taxable Year
Income Tax
50% Penalty
1933
$ 67.76
$ 33.88
1934
706.64
353.32
1935
562.56
281.28
1936
1,372.11
686.06
1937
388.78
194.39
1938
2,589.42
1,309.56
1939
2,254.70
1,144.59
1940
8,531.05
4,325.70
1941
28,548.08
14,274.04
1942
34,666.14
17,333.07
1943
69,081.87
34,367.54
Total
$148,769.11
$74,323.43
Paul Haimovitz (Docket No. 15937) and S. Herman Rosenberg (Docket No. 15940) also resist respondent's claim that they are liable, in the amounts as set forth above, as fiduciaries of the Estate of Ben Haimovitz, deceased. 4. The deficiencies in income taxes and penalties due from the Estate of Ben Haimovitz, deceased (Docket No. 30454), and the liability of Ethel Haimovitz Krieger (Docket No. 30420), S. Herman Rosenberg (Docket No. 30440), Florence Haimovitz Rosenberg (Docket No. 30442), Haimovitz Realty Corporation (Docket No. 30444), Belmont Lumber Company, Inc. (Docket No. 30446) and Paul Haimovitz (Docket *282 No. 30448) as transferees of the assets of the Estate of Ben Haimovitz, deceased, for such deficiencies as follows: Amount of Deficiency
Income
25% Delin-
Taxable Year
Tax
quency Penalty
1944
$29,015.53
$ 7,708.46
1945
14,552.34
4,441.61
1946
30,744.08
8,225.51
1-1-47 to 3-7-47
300.00
75.00
Total
$74,611.95
$20,450.58
S. Herman Rosenberg (Docket No. 30440) and Paul Haimovitz (Docket No. 30448) also place in issue respondent's claim that they are liable, in the amounts as set forth above, as fiduciaries of the Estate of Ben Haimovitz, deceased. 5. The deficiency of $368.47 in income taxes of the Estate of Ben Haimovitz, deceased (Docket No. 30455), for the taxable period March 7, 1947 to December 31, 1947. The questions remaining, after concessions by both parties, are as follows: 1. When was taxable income realized from deferred payment sales of real estate, and when realized, was it taxable as ordinary income or as capital gain, or reportable under section 44, Internal Revenue Code of 1939 and, in any event, what was the amount? 2. Did an officer-stockholder realize dividend income when he withdrew and retained corporate property, *283 or did he receive the property as nontaxable embezzlement proceeds? 3. Were 50 per cent fraud and 25 per cent delinquency penalties properly imposed; and if not, as to fraud, does the statute of limitations bar the tax years of Ben Haimovitz for 1933 through 1943? 4. Was there a liability as transferees or fiduciaries, or both, for the deficiencies involved? Findings of Fact Some of the facts have been stipulated and are hereby found. Ben Haimovitz, until his death on March 2, 1947, resided in Tampa, Florida. For the taxable years 1933 through 1946, his individual income tax returns were filed on a cash basis with the collector of internal revenue for the district of Florida. A fiduciary income tax return was filed by the Estate of Ben Haimovitz, deceased, for the taxable period March 2, 1947 [2] through December 31, 1947. Lillian Haimovitz, until her death on February 18, 1946, resided in Tampa, Florida. For the taxable years 1939 through 1945, her individual income tax returns were filed on a cash basis with the collector for the district of Florida. In 1946 a tentative fiduciary income tax return was filed by the Estate of Lillian Haimovitz, deceased. Belmont Lumber Company *284 is a corporation which has its principal place of business in Tampa, Florida. For the fiscal years ended September 30, 1933 through September 30, 1944, Belmont's income and excess profits tax returns were filed on an accrual basis with the collector for the district of Florida. Ben was born in Roumania on September 7, 1885. He came to the United States in 1900, settled in Tampa in 1903, and became a naturalized citizen of the United States in 1909. Lillian was his wife, and they were the parents of petitioners Florence, Ethel, and Paul. At the time of this hearing, all three children were married. Ethel and her husband, David Krieger, lived in Freeport, Long Island, New York; Florence, and her husband, S. Herman Rosenberg, lived in Tampa, Florida, where Herman was employed by Belmont; and Paul and his wife, Mary, lived in Tampa where Paul was employed by Belmont as its principal executive officer. After settling in Tampa, Ben entered the real estate business. This was his principal activity until about 1926, and over the years he gradually accumulated, through purchase and construction, a substantial number of *285 Negro rental properties from which, from 1933 until his death, he realized income. He also derived income from the construction and sale of houses on land which he owned, from interest on mortgages and contracts for the sale of real estate, together with some income from a few securities and United States bonds which he had acquired over these years. Lillian had also acquired real estate from which she realized income from 1939 until her death. From her ownership of property, Lillian realized rental income, income from the construction and sale of houses on parcels of land in certain subdivisions, and interest received on mortgages and contracts for the sale of real estate executed in connection with her property. In 1926 Ben acquired the assets of a defunct lumber concern and engaged in the retail lumber and building material business as a sole proprietorship. On or about October 1, 1932, he incorporated Belmont to take over and operate this business, and on or about October 6, 1932 he transferred its assets to Belmont. In addition, he, joinedby Lillian, transferred by deed on or about the same date certain real estate. Among the properties conveyed by this deed was the lumberyard *286 where the proprietorship had been operated. The real estate received from Ben was set up on Belmont's books at a cost of $22,025 and the other assets of the lumber business received from him were set up at a cost of $10,535.92. According to Belmont's minute book, the corporate officers elected in 1932 were Ben, president and treasurer, and W. L. McCrary, secretary. The corporate directors elected in 1932 were Ben, McCrary, and Lillian. McCrary, who had been employed by Belmont shortly after it was formed, died on October 5, 1944, and, according to Belmont's minute book, Paul was elected to succeed him as secretary and director of the corporation. According to Belmont's stock book, of the 100 shares of capital stock Belmont was authorized to issue, there were 61 shares outstanding at October 1, 1932. There were no changes in the holdings of Belmont's stock after October 1, 1933, except on July 2, 1945 and February 13, 1947. The stockholdings as disclosed by the stock book are as follows: Number of Shares
Oct. 1,
Oct. 1,
July 2,
Feb. 13,
Stockholder
1932
1933
1945
1947
Ben
40
1
2
2
Lillian
10
68
43
McCrary
1
1
Paul
10
15
30
Florence
10
10
15
29
Ethel
10
15
29
Herman
10
10
Total
61
100
100
100
*287 The business affairs of Belmont were managed and directed by Ben from October 1, 1932 until about April 19, 1944. He was at all times until his death the president of Belmont, and although bedridden from April 1944 until his death, Ben was kept informed and continued to control its affairs. Herman was employed by Belmont in 1939 when he came to Tampa. He had no experience in the lumber business, but from 1939 to 1944 he worked for Belmont as a salesman and when Ben became ill in 1944, Herman assumed the general managership of Belmont and shortly thereafter shared its general managership with Paul. Paul was employed by Belmont in 1943, and since 1947 has been its president. Prior to becoming president, Paul was one of the salesmen and also helped with the shipping. Since becoming Belmont's president, he performs the administrative functions and participates in its sales work. McCrary, prior to his death, kept Belmont's books, which were based on a double entry system of accounting. There was no cash account on these books until April 28, 1944. Under this method of bookkeeping, the only entries which show the receipt or disbursement of cash were posted to Ben's personal account. *288 Belmont had no bank account. Cash receipts were handled by Ben, and disbursements were made by him either in cash or by checks drawn on his personal bank accounts. Belmont's board of directors duly adopted a resolution on August 4, 1941 which authorized Ben "to cash or otherwise negotiate checks made payable to the corporation, and handle the proceeds thereof as he may desire." Although the minutes of the meeting do not indicate which of the directors were present, the members of the board at the time were Ben, Lillian, and McCrary. Over the years in controversy, Ben engaged several different certified public accountants to prepare some of the Federal tax returns which were filed by himself, Lillian, and Belmont. Sometime around 1927, he engaged H. B. Foy, a certified public accountant practicing in Tampa, who prepared Ben's and Belmont's returns for 1933 through 1937. Ben engaged the accounting firm of M. A. Montenegro & Company to prepare his and Lillian's returns for 1941 and 1942, and Belmont's returns for 1941 through 1943. J. Paul Smith, the employee of that firm who prepared these returns, is now a certified public accountant and a member of the firm of M. A. Montenegro & *289 Company. In 1943 Ben engaged the services of David M. Schwartz, a certified public accountant located in Tampa. Schwartz was engaged to represent generally the Haimovitz interests, including Ben, Lillian, and Belmont, in the various income tax investigations which were pending against the three taxpayers at that time. Schwartz prepared Ben's returns for 1943 through 1946, and Lillian's returns for 1943 through 1945. He also prepared the fiduciary income tax return filed by Ben's estate for the taxable period March 2, 1947 through December 31, 1947, and the tentative fiduciary return filed by Lillian's estate for 1946. Ben's returns which were prepared by Foy were prepared on the basis of information which Ben had compiled and submitted to him. From this information, Foy prepared the returns in rough draft and, if any additional information was needed, he asked Ben to produce it. Foy usually discussed the rough draft with Ben before the final return was prepared. Generally there were no changes made on the rough draft, but occasionally some changes were made. The returns which Smith prepared for Ben and Lillian were also prepared on the basis of information compiled and submitted *290 by Ben. Before Smith prepared the returns, he and Ben discussed the information which Ben had submitted. Most of the returns which Foy prepared for Belmont were prepared on the basis of information submitted by Ben. Foy never did any audit work on Belmont's books although he may have made some closing entries. In the process of preparing Belmont's tax returns for these years, Foy discovered that there was no cash account maintained on Belmont's books and that Belmont did not have a bank account. He also discovered that all of Belmont's cash receipts were deposited by Ben in his own bank account; that the cash receipts which were recorded on Belmont's books were debited to Ben's personal account which was maintained on Belmont's books, and the appropriate offsetting account was credited. Conversely, he also found that when Ben paid an obligation of Belmont, Ben's personal account was credited and an expense account debited. Foy regarded the manner in which Belmont's cash receipts were handled by Ben as abnormal and discussed this situation with McCrary. The returns which Smith prepared for Belmont were prepared from information submitted by Ben and from information which Smith took *291 from Belmont's books. A journal, a general ledger, and an accounts receivable ledger were submitted to Smith as Belmont's books of account, and it was his understanding at the time that he prepared Belmont's returns that these were all of the books necessary for the preparation of Belmont's returns for those years. Smith did not verify either the information contained in Belmont's books or the information which Ben submitted to him, but the returns, based on the books as presented, reflected what the books showed. In the course of preparing these returns, Smith discovered that Belmont had no bank account; that there was no cash account maintained on its books of account; and that its cash receipts and disbursements were recorded in Ben's personal account. Smith regarded the manner in which Belmont's cash receipts were handled as unorthodox and abnormal. He discussed this condition with Ben and suggested that a bank account be opened for Belmont. This suggestion, however, was not followed. Smith stopped preparing Federal tax returns for Ben, Lillian, and Belmont after September 30, 1943. He stopped preparing Belmont's returns because its records were unsatisfactory and he did not have *292 the time in view of the manpower shortage to correct errors in its books. Between 1932 and 1947 Belmont held record title to a number of rental properties and other parcels of real estate. The rentals from these properties were collected by Ben and, prior to 1944, were not recorded on Belmont's books. In addition, from time to time, parcels were sold or contracts for future title delivery were negotiated and the proceeds from such transactions were likewise collected by Ben without recordation on Belmont's books. During the 1932-1943 period, Ben constructed houses or other buildings on lots to which either he or Lillian held record title. Some of the lumber and other materials used in this construction was obtained from Belmont, and in some instances no entries were made on Belmont's books to record such transactions. For 1941 through 1943, there are closing journal entries on Belmont's books which credit sales and debit Ben's personal account for materials and labor used by him in amounts as follows: Fiscal
Debit to Ben's
Credit
Year Ended
Materials
Labor
Personal Acct.
to Sales
9-30-41
$7,300.00
$ 900.00
$8,200.00
$8,200.00
9-30-42
6,456.59
1,224.00
7,680.59
7,680.59
9-30-43
1,784.75
1,784.75
1,784.75
*293 These entries were furnished by Smith at the time he prepared Belmont's tax returns for those years, and were made for the purpose of charging Ben's personal account with the amount of materials which be had withdrawn from Belmont for use in this construction but which prior thereto had not been recorded on Belmont's books. Also included in these adjusting entries were materials withdrawn by Ben to repair rental houses. Ben submitted the information from which these closing entries were prepared. In connection with the closing entry for 1941, Ben orally submitted his estimate of materials that he had withdrawn from Belmont; in connection with the closing entries for 1942 and 1943, he submitted a list which purported to show the amount of materials which he had withdrawn from Belmont. Smith did not verify the list against Belmont's books. On Belmont's books for 1942 there is a closing journal entry which credits sales and debits Ben's personal account in the amount of $5,198.58 and which is explained as cash sales collected and retained by Ben. For 1943 there is a similar journal entry in the amount of $31,018.61. These closing entries were furnished by Smith at the time he prepared *294 Belmont's returns for those years, and represented the cash sales of Belmont which had been turned over to Ben but not recorded on its books. The 1942 entry is based on information contained on an adding machine tape furnished by Ben and which disclosed Belmont's cash sales for each month of that fiscal year. Similarly, the 1943 entry was also based on information furnished by Ben. Smith did not verify the information upon which either of these closing entries was made because such information was not recorded on Belmont's books or any other records furnished to him by Ben. No information pertaining to the bank account in which Ben deposited Belmont's cash receipts was submitted to either Foy or Smith from which they could verify the information Ben had given them. Even when Belmont's cash receipts were recorded on its books, it would not show on those books whether Ben applied any funds to his own personal use. Smith did not analyze Ben's personal account maintained on Belmont's books for any of the years in which he prepared Belmont's tax returns. Belmont's charge sales were recorded in an accounts receivable ledger. The examination of Belmont's tax returns and the individual returns *295 of Ben and Lillian was conducted by Internal Revenue Agent C. J. Townley and Special Agent J. B. Hill. Townley commenced the examination in October 1942 and was joined by Hill from November 1943 to December 1944. When Townley commenced the field examination only Belmont's tax returns for 1939 through 1941 were under consideration, but the examination was extended to cover the returns filed by Ben and Lillian for those years when it was discovered that there was no cash account on Belmont's books and that all of its cash receipts were turned over to Ben who deposited them in his personal account. Later the examination was extended to cover all of the tax returns filed by Belmont for the fiscal years 1933 through 1947, and the individual returns of Ben and Lillian for all of the years in question. The only books of Belmont which Ben made available to Townley when that examination was commenced were a general ledger, an accounts receivable ledger, and a cash journal. After the examination was extended to include the individual returns of Ben and Lillian, Ben was requested to submit his books. When Ben stated that he did not keep any books, Townley examined, over Ben's objection, the bank *296 account in which Ben deposited the cash receipts of Belmont, that were turned over to him, and took off the cash deposits and withdrawals. On April 30, 1943, approximately 6 months after he had begun the investigation, Townley filed his preliminary reports concerning the tax liabilities of Ben and Belmont. The findings made against Ben at that time were based generally upon the analysis Townley made of Ben's personal bank account but also upon certain information submitted by Ben. After receipt of these reports, Schwartz prepared and filed a protest and a supplemental protest against the adjustments made to the tax liabilities of Ben and Belmont. The original protest was generally against the adjustments made against Ben's and Belmont's tax liability set forth in the reports which Townley filed at that time. The supplemental protest contained detailed information which theretofore Ben had not furnished Townley for his investigation purposes and disclosed that there were other records which were not made available to Townley from which the information contained therein was taken. The supplemental protest was referred to Townley for examination, and at that time another request was *297 made to Ben for the records which had been used in the preparation of the supplemental protest. As a result, Townley was furnished additional books of Belmont and some personal records of Ben's. Among the records made available at that time were a book disclosing the rent collections made by Ben on various rental properties and a ledger disclosing the collections made by Ben on mortgages and real estate sales contracts. The ledger contained approximately 200 accounts. Also made available to Townley at that time were some records disclosing the daily cash receipts, both for Ben personally and for Belmont. The entries in these books began sometime in May 1935 and covered the fiscal years of Belmont through September 30, 1942. Among the types of cash receipts recorded in these records were cash payments received by Belmont on its accounts receivables, mortgages, and real estate sales contracts, and rents collected by Ben on rental property belonging to Belmont. Also included were Ben's personal receipts and Belmont's cash sales. Not all of Belmont's cash receipts disclosed by these records were posted to its books. Those that were posted to its books were checked off and represented *298 receipts applicable to Belmont's accounts receivable set up on its books. Ben's personal cash receipts as disclosed by these records were identified by symbols such as "B" or "BH." All other items, which were not identified by a mark of any sort, such as Belmont's rent receipts, the payments it received on its real estate sales contracts and mortgages, and its cash sales, were deposited in Ben's personal bank account without any recordation being made to Belmont's books of account whatsoever. As disclosed by these records, the cash sales which Belmont made from 1936 through 1942 are as follows: Fiscal Year Ended
Belmont's Cash Sales
September 30
per Cash Receipts Records
1936
$2,726.16
1937
3,175.30
1938
3,859.54
1939
3,862.29
1940
3,912.93
1941
5,153.44
1942
8,944.62 With the exception of 1942, none of the cash sales as disclosed by these records were posted to Belmont's books or reported in its gross sales figure on its tax returns for these years. Respondent determined that Belmont's cash sales were understated for each of the years, excepting 1942, in the above amounts, respectively. In connection with the cash sales made by Belmont during 1942, *299 cash sales of $5,198.58 were posted to Belmont's books as a result of the closing entries prepared by Smith for that fiscal year, resulting in Belmont's cash sales for 1942 being understated by $3,746.04. The cash sales which Belmont made for 1943 were not recorded in these cash receipts records. However, cash sales in the amount of $31,018.61 were posted on its books as a result of the closing entries prepared by Smith for that fiscal year. No adjustment was made to this cash sales figure. No rental income was reported on Belmont's tax returns for 1933 through 1944. During each of these years, Belmont realized rental income from property which had been transferred to it by Ben at the time of its inception. Ben collected all of Belmont's rental receipts for such years, deposited them in his personal bank account without recording them on Belmont's books, and reported the receipts on his individual tax returns for those years. The net rental income which Belmont realized but did not report on its tax returns for those years is as follows: Fiscal Year Ended
Unreported
September 30
Rental Income
1933
$2,210.05
1934
2,210.05
1935
2,289.50
1936
2,289.50
1937
2,289.50
1938
2,368.96
1939
2,799.52
1940
2,859.28
1941
2,942.17
1942
2,832.35
1943
3,511.18
1944
3,107.50
*300 The materials Ben withdrew from Belmont for the construction and repair of houses and other buildings on property owned by either Lillian or himself, and which were not recorded on Belmont's books for the fiscal years 1933 through 1943, were in amounts as follows: Fiscal Year Ended
Unrecorded
September 30
Materials Withdrawn
1933
$ 4,188.00
1934
3,650.00
1935
3,000.00
1936
4,300.00
1937
1,500.00
1938
5,150.00
1939
7,350.00
1940
13,575.00
1941
15,725.00
1942
* 2,275.00
1943
2,190.25
The net income reported on Belmont's tax returns for 1933 through 1943, and its net income as adjusted by respondent, are as follows: Fiscal
Year Ended
Net Income
Adjusted
September 30
per Return
Net Income
1933
($ 1,694.79)
$ 6,581.52
1934
342.12
7,422.62
1935
4,058.73
10,120.80
1936
765.90
13,168.56
1937
1,685.34
8,218.14
1938
1,994.24
15,264.49
1939
2,614.41
20,990.60
1940
4,843.58
31,820.68
1941
(4,006.01)
26,124.02
1942
9,214.32
22,572.72
1943
10,949.54
17,428.97
Total
$30,767.38
$179,713.12 The net income reported on Belmont's tax return for 1944 is $7,442.57; *301 its net income as adjusted by respondent is $14,183.07. The balances in Belmont's surplus account at the end of each of the fiscal years 1933 through 1944, as disclosed by its books, as determined by respondent, and as revised, are as follows: Surplus
Surplus
Fiscal
per
per Revenue
Surplus
Years
Books
Agent's Report
As Revised
1933
$22,656.74
$19,771.29
$19,771.29
1934
22,998.86
23,797.83
23,797.83
1935
27,010.55
30,622.71
30,622.71
1936
26,968.81
29,824.20
29,824.20
1937
28,566.94
36,188.75
36,188.75
1938
28,317.67
44,862.46
44,862.46
1939
30,772.54
59,806.76
59,940.52
1940
35,289.32
75,171.25
75,625.30
1941
30,561.42
64,540.36
65,237.23
1942
41,669.57
55,099.38
55,876.73
1943
48,688.01
14,601.00
15,387.51
1944
54,298.88
9,043.14
9,387.88
On June 25, 1946 respondent sent to Belmont, by registered mail, a statutory notice of deficiency in which he determined deficiencies of $24,498.29 and penalties of $12,247.17 for the years 1933 through 1943. This deficiency notice was based on Townley's supplemental report, dated February 18, 1946, in which he increased Belmont's income over that shown on his previous *302 report by $2,900, $8,575, and $16,550 for the years 1939, 1940 and 1941. On November 15, 1946 the deficiencies and penalties determined therein were assessed. Thereafter, Belmont paid these deficiencies, filed claims for refund, and instituted suit in the United States District Court for the Southern District of Florida for recovery of the amounts paid. The suit for refund had not been tried and was still pending at the time of this hearing. As a result of his retention of Belmont's cash receipts and his withdrawal of materials, Ben received taxable dividends from Belmont during each of the years 1940 through 1944 in amounts as follows: Amount of Dividend
Calendar Year
Received by Ben
1940
$ 6,625.58
1941
28,329.07
1942
25,434.15
1943
51,953.08
1944
10,481.26
For 1941 and 1942, the salary income which Ben reported on his returns, his correct salary income, and the understatement of his salary income are: Understate-
Salary
Correct
ment of
Calendar
Income
Salary
Salary
Year
per Return
Income
Income
1941
$4,125.00
$4,500.00
$375.00
1942
4,200.00
4,600.00
400.00
The houses which Ben built during the 1932-1943 period *303 on property owned by either Lillian or himself were, in general, cheap constructions. Usually it took from 10 days to 3 weeks, depending upon the number of carpenters, to put up one of these houses. Ben built such houses in Ben's Subdivision, Tampa Overlook Subdivision, and Tulsa Heights Subdivision. Each of the houses was 20 feet by 24 feet. The houses in Tulsa Heights were finished on the inside; the houses in Ben's Subdivision and Tampa Overlook were unfinished on the inside. At the time of trial these types of houses were still being constructed in Tampa Overlook. Ben submitted to Belmont a list of the materials which he would need to construct these houses. After the order was computed and filled, the materials were delivered to the building site and the material list from which the order was filled was given to McCrary, the bookkeeper. The cost of materials used in each of the houses constructed in Tampa Overlook and Tulsa Heights was $300 and $350, respectively, and the cost of labor on each of these houses was $75 and $100, respectively. The lots in Tampa Overlook and Tulsa Heights cost $7 and $44, respectively. The number of houses constructed in these subdivisions from *304 1939 through 1944 is as follows: No. of Houses
No. of Houses
Built in
Built in
Year
Tampa Overlook
Tulsa Heights
1939
None
11
1940
19
5
1941
22
7
1942
3
3
1943
1
None
1944
2
None Some of these houses were constructed on more than one lot. Ben did not pay all of the labor costs in constructing the houses which he built in Ben's Subdivision, Tampa Overlook, and Tulsa Heights. About onehalf of these labor costs was paid by Ben with Belmont's cash receipts. From 1933 through 1946, Ben sold some of the real estate which he owned. During 1939 through 1945 and the period January 1 through February 18, 1946, Lillian also sold some real estate. Commencing with 1939, many of the sales of real estate made by Ben and Lillian were effected by one or the other of two types of instruments captioned "Agreement for Deed" or a "Lease with Option to Purchase." A "Lease with Option to Purchase" is used extensively and much more frequently than the "Agreement for Deed" by realtors throughout the Tampa area in connection with the sale of real estate. The realtors sell, assign, and otherwise trade in both types of instruments. Generally these instruments are *305 sold at a discount of 10 per cent of their face value. A typical "Agreement for Deed" used by Ben and Lillian contains the following certificate: "I HEREBY CERTIFY, That on this day personally appeared before me, an officer duly authorized to administer oaths and take acknowledgements Ben Haimovitz and Lillian Haimovitz to me well known to be the (persons) described in and who executed the foregoing instrument, and… acknowledged before me that they executed the same freely and voluntarily for the purposes therein expressed. "AND I FURTHER CERTIFY, That the said Lillian Haimovitz known to be the wife of the said Ben Haimovitz on a separate and private examination taken and made by and before me, separately and apart from her said husband, did acknowledge that she made herself a party to said instrument for the purpose of renouncing, relinquishing and conveying all her right, title and interest, whether of dower, homestead or separate property, statutory or equitable, in and to the lands described therein, and that she executed the said instrument freely and voluntarily and without any compulsion, constraint, apprehension or fear of or from her said husband." and the following *306 provision for recordation: "Articles of Agreement FOR DEED No…. Fee $1.35 / PL Return to… From Ben Haimovitz….70 To * * *
R-2 Box 943 Dated Tampa 5, 19 . Filed for Record in the office of the Clerk of the Circuit Court of the County of HILLS-BOROUGH, State of Florida, on the… day of Dec. 31, 1943, 19… and Recorded in Book No. 1263 on Page 63 and the Record verified. CHAS. H. PENT Clerk of the Circuit Court. By Percy Page, D.C. 2611 Dec. 31, '43" The profits which Ben and Lillian realized from their respective real estate transactions during the years in question are as follows: A
B
Profit on Transactions
which involved "Agree-
ment for Deed" or
Profit on
"Lease with Option to
Year
"Completed Sales"
Purchase"
Ben
Lillian
Ben
Lillian
Haimovitz
Haimovitz
Haimovitz
Haimovitz
1939
$1,236.00
$ 3,325.69
1940
$ 2,112.87
639.50
$ 6,204.70
5,866.28
1941
2,504.01
2,054.00
8,771.66
8,015.26
1942
3,956.00
* 2,400.00
6,788.61
* 9,420.78
1943
2,816.46
1,952.46
7,821.96
5,351.22
1944
13,910.80
11,471.13
10,489.50
1945
14,872.75
212.75
7,802.07
3,279.64
1946
3,000.00
625.50
*307 Half of the transactions involved in column B were the result of leases with options to purchase. Ben and Lillian either failed to report any income from the above sales of real estate or they reported less than the above profit realized during the years in question on their returns for those years. Ben's and Lillian's interest income for 1939 through 1945 is as follows: Lillian's
Calendar
Ben's Interest
Interest
Year
Income
Income
1939
$1,578.90 *
$1,684.64
1940
2,554.84
2,253.38
1941
3,585.92
2,881.92
1942
5,124.73
* 3,576.31
1943
6,081.34
3,868.14
1944
5,676.21
3,708.56
1945
5,986.67
3,908.03 Lillian either failed to report any of the above interest income or she reported less than the above amounts during the years in question on her returns for those years. The interest income which Ben reported on his returns and the understatement of interest income for those years are as follows: Understatement
(or Over-
Calendar
Interest Income
statement) of
Year
per Return
Interest Income
1940
$ 535.19
$2,019.65
1941
4,539.99
(954.07)
1942
1,552.91
3,571.82
1943
5,576.77
504.57
*308 For the years 1944 through 1946, the gross rental income received by Ben, the net rental income determined by respondent, and the actual net rental income, are as follows: Net Rental
Gross
Income
Net
Calendar
Rental
Determined
Rental
Year
Income
by Respondent
Income
1944
$8,022.78
$4,801.92
$4,801.92
1945
6,494.23
3,812.79
3,812.79
1946
3,963.20
6,619.11
2,369.99 Ben's net rental income for the taxable period January 1 through March 7, 1947 was $187.50. For the years 1940, 1941, and 1943 through 1946, the gross rental income received by Lillian, the net rental income determined by respondent, and the actual net rental income, are as follows: Net Rental
Gross
Income
Net
Taxable
Rental
Determined
Rental
Period
Income
by Respondent
Income
1940
$3,312.63
$4,132.05
$2,186.33
1941
3,172.55
6,299.06
2,093.88
1943
4,136.88
7,160.73
2,730.34
1944
3,962.87
5,096.06
2,615.49
1945
1,795.81
4,822.86
1,185.23
1946
411.50
68.37
68.37
Lillian died intestate on February 18, 1946, and on June 14, 1946 Ben was duly appointed administrator of her estate by the probate court of Hillsborough *309 County, Florida. At her death, Lillian owned real estate, mortgages, contracts for the sale of realty, a 1939 Oldsmobile sedan, and 43 shares of Belmont stock. On June 25, 1946 respondent sent, by registered mail, a statutory notice of deficiency to Lillian's estate, Ben Haimovitz, Administrator. Respondent determined deficiencies of $69,591.20 in income taxes for the taxable years 1939, 1940, 1941, and 1943. There was no petition filed with the Tax Court from this statutory notice of deficiency and on November 15, 1946 the deficiencies determined therein were assessed but such deficiencies have not been paid. On January 13, 1947 the collector for the district of Florida executed a "NOTICE OF TAX (LIENS) UNDER INTERNAL REVENUE LAWS," Form 668, in favor of the United States upon all property and rights to property of Lillian Haimovitz, deceased, for the assessed but unpaid income taxes due from Lillian, together with interest thereon, in the total amount of $83,400.56. This notice of tax lien was filed with the clerk of Hillsborough County, Florida, and made a matter of public record on January 20, 1947. On January 22, 1947 the probate court duly appointed appraisers to appraise *310 the real and personal property owned by Lillian at her death. The value which the appraisers placed on Lillian's real and personal property is as follows: Value per
Property
Appraiser's Report
Real Estate
$1,500.00
Mortgages and Contracts
4,447.07
1939 Oldsmobile sedan
650.00
43 Shares of Belmont stock
4,300.00 On February 13, 1947 Ben, as administrator of Lillian's estate, petitioned the probate court for an order approving accounts and directing distribution of her property in equal proportions to himself, Florence, Ethel, and Paul, but Ben died before the administration of Lillian's estate was completed and by order dated March 19, 1947 the probate court appointed Paul as substitute administrator to succeed Ben. Paul distributed the assets of Lillian's estate, and he, Florence, and Ethel each acknowledged the receipt of one-fourth of the assets, which they received as the surviving heirs of Lillian. On March 19, 1947 Paul, as substitute administrator of Lillian's estate, petitioned the probate court for an order approving the distribution, discharging Ben as administrator of Lillian's estate, and discharging the estate and the heirs including himself *311 as substitute administrator. On March 20, 1947 the order of final discharge was granted in accordance with the petition. As distributions from Lillian's estate, Paul, Ethel, and Florence received 15, 14, and 14 shares of Belmont stock, respectively, on or about February 13, 1947, and received other property on or about March 18, 1947. The fair market value of the Belmont stock at the date of distribution was $1,000 per share. As a result of the distribution of the assets of Lillian's estate to Paul, Ethel, and Florence in 1947, Lillian's estate became insolvent, and is still insolvent and unable to pay the taxes and interest due by Lillian Haimovitz, deceased, for the taxable years 1939, 1940, 1941, and 1943. At the time Paul, as substitute administrator, distributed the assets of Lillian's estate to himself, Ethel, and Florence, he knew that respondent was examining Lillian's income tax liability for the period prior to her death and that such liability had not been finally determined. The deficiencies in income taxes and penalties determined by respondent against Lillian's estate, and the liabilities determined against Paul, Ethel, and Florence for the income taxes and penalties *312 due from Lillian's estate for the years 1944 and 1945, and the taxable period January 1 through February 18, 1946, have not been paid. On May 14, 1946, Haimovitz Realty Corporation, hereafter sometimes called Realty, was incorporated by Ben under the laws of Florida and it was authorized to issue 100 shares of no-par value common stock. Its principal place of business was Tampa, Florida. Its books were kept on the basis of a fiscal year beginning July 1. On or about June 11, 1946, and during July and August 1946, Ben conveyed certain real estate, notes, mortgages, and real estate sales contracts to Realty. At the date of transfer, the fair market value of the properties so conveyed was $158,678.73, and there were outstanding and unpaid real property taxes due on the properties in the amount of $6,643.94. The corporate organization of Realty was effected on or about June 12, 1946, and incident thereto Ben arranged for the stock, all of which belonged to him, to be issued 10 shares to himself and 5 shares each to Herman, Florence, Paul, Mary Haimovitz, Ethel and David Krieger. The persons to whom this stock was issued, with the exception of Ben, paid no monetary consideration to *313 either Ben or Realty for their respective shares. Both when issued and at Ben's death, the Realty stock had a fair market value of $3,823.62 per share. Ben received no consideration from Realty other than the 10 shares of capital stock it issued to him. The officers of Realty elected in 1946 were Ben, president, Florence, vice president, Paul, treasurer, and Herman, secretary. These same individuals constituted its board of directors. After the conveyance of property to Realty in June, July, and August 1946, Ben retained assets which had a fair market value of $165,316.17. At the same time he had no liabilities except those for Federal income taxes and penalties in an undetermined amount and an alleged liability of $127,591.01 which petitioners contend was due from Ben to Belmont. On June 25, 1946 respondent sent to Ben, by reigistered mail, a statutory notice of deficiency in which he determined deficiencies of $148,769.11 and fraud penalties of $74,323.43 for the years 1933 through 1943. Ben did not appeal to the Tax Court, and on November 15, 1946 the deficiencies and penalties were assessed. On January 13, 1947 the collector for the district of Florida executed a "NOTICE OF *314 TAX (LIENS) UNDER INTERNAL REVENUE LAWS," Form 668, in favor of the United States upon all property and rights to property of Ben, for the assessed but unpaid income taxes and penalties due from Ben, together with interest, in the total amount of $256,663.40, for the taxable years 1933 through 1943. This notice of tax lien was filed with the clerk of Hillsborough County, Florida, and made a matter of public record on January 20, 1947. Respondent mailed notices of transferee liability to Ethel, Florence, Herman, Belmont and Haimovitz Realty Corporation on June 30, 1947. Ben's returns for the calendar years 1940 through 1943 were filed with the collector on the following dates: Year
Date of Filing
1940
May 15, 1941 *
1941
March 16, 1942
1942
April 15, 1943 *
1943
Sept. 15, 1944 * Prior to the expiration of the period for assessment for 1940 and 1941, consent agreements were executed by Ben and respondent extending the period of assessment for these years as follows: Date
Date
Extending
Executed
Executed by
Assessment
Year
by Ben
Commissioner
Date to
1940
12- 3-43
12- 7-43
6-30-45
1940
1-29-45
1-31-45
6-30-46
1941
1-29-45
1-31-45
6-30-46
*315 After the deficiencies had been assessed against Belmont on November 15, 1946. Ben transferred $38,790 to Belmont, of which $13,790 was cash on or about January 31, 1947, and $25,000 was by checks written on Ben's personal bank accounts. The first of these checks, dated February 14, 1947 and drawn on The Broadway National Bank, Tampa, was for $5,000 and signed by Ben. The second check, dated February 15, 1947 and drawn on the First National Bank, Tampa, was also for $5,000. The third check, dated February 28, 1947 and drawn on The Broadway National Bank, was for $15,000 and was signed "Ben Haimovitz by S. Herman Rosenberg." Ben transferred this money to Belmont partially to pay his alleged obligation to it, but he received no other consideration from Belmont for this transfer. The receipt of this money was recorded on Belmont's books in an account captioned "Suspense." Ben died intestate on March 2, 1947. Paul and Herman were appointed administrators of his estate by the probate court of Hillsborough County, Florida, and the estate is still in the process of administration. There has been no Federal estate tax return filed by or on behalf of Ben's estate, and there is no record *316 in the office of the collector for the district of Florida of any Federal gift tax returns having been filed at any time by Ben. At his death Ben owned certain property consisting of cash, stock, bonds, mortgages, and contracts for the sale of real estate. Paul, Florence, and Ethel were the next of kin and heirs at law surviving Ben. Subsequent to Ben's death, Paul and Herman, as administrators of his estate, disbursed $15,195.34 to Belmont from the assets of his estate, disbursing $7,879.63 on or about March 31, 1947, and $7,315.71 on or about June 30, 1947. Paul and Herman knew, when they disbursed these funds, that there were outstanding and unpaid deficiencies due by Ben for taxable periods prior to his death. By 1944, Paul and Herman were aware, as were other members of the Haimovitz family, that respondent's agents were investigating the tax returns of Ben, Lillian, and Belmont for the years prior thereto. The receipt of these funds was recorded on Belmont's books in an account captioned "Suspense." On March 18, 1947 the probate court of Hillsborough County, Florida, appointed appraisers to appraise the property owned by Ben at his death. According to the appraisers' report, *317 dated August 25, 1947, the value of all property owned by Ben at his death was $86,091.44. Among the appraised assets were 10 shares of Realty stock which were assigned a value of $1,000. The fair market value of all property owned by Ben at the date of his death, including 10 shares of Realty stock, was $123,327.64. On June 5, 1947 the collector for the district of Florida filed a proof of claim against Ben's estate, setting forth the deficiencies in income taxes and penalties, together with interest, which were assessed and due, with accrued interest thereon, from Ben's estate for the years 1934 through 1936, and 1938 through 1943 in the total amount of $263,077.02. Although this timely proof of claim was filed with the administrators of Ben's estate, the claim has not been paid. On October 30, 1947 the collector filed an additional proof of claim against Ben's estate for income taxes and interest which were assessed and due, with accrued interest thereon, from Ben for 1946 in the total amount of $1,700.06. After Ben's death, Paul was elected president, Florence and Ethel were elected vice presidents, and Herman was elected secretary-treasurer of Belmont. These four individuals *318 also constituted its board of directors. On November 14, 1947 Paul, as president and on behalf of Belmont, filed a proof of claim in the amount of $127,591.01 against Ben's estate. Paul was authorized to file this claim by a resolution adopted by Belmont's board of directors on November 12, 1947. This resolution was adopted as a result of a letter received by Paul from Schwartz. In that letter Schwartz recommended that Ben's estate be subjected to a charge in an amount equal to the value of assets which flowed to Ben from Belmont without proper consideration and without corporate authority. The total of the items forming the basis of Belmont's alleged claim against Ben's estate is as follows: Corporate Rents Collected by Ben,
1933-1943
$ 28,602.06
Materials Withdrawn by Ben, 1933-
1943
72,053.25
Profit on Sale of Corporate Real
Estate Retained by Ben, 1935
500.00
Cash Sales Retained by Ben, 1936-
1942
26,435.70
Total
$127,591.01 The information contained in Schwartz's letter was based on the statutory notice of deficiency which respondent mailed to Belmont; Schwartz has never made, nor has he ever been requested to make, an audit of Belmont's books in order *319 to arrive at any independent figures of his own in connection with the claim which was filed for Belmont against Ben's estate. Schwartz is still employed by Belmont and the other members of the Haimovitz family. In connection with closing Belmont's books for the fiscal year ended September 30, 1947 the following adjusting journal entries, among others, were made: "Dr.
Cr.
"7. Estate of Ben Haimovitz
$127,591.01
To Surplus
$127,591.01
To charge the Estate of Ben Haimovitz and thereby
create an A/Rec. against said Estate by authority of
minutes dated 11/12/47 as a result of the determina-
tion by the Income Tax Authorities that the dece-
dent Ben Haimovitz did in fact retain the proceeds
of certain transactions constituting the business of
the Belmont Lumber Co. and by so doing did in
fact declare to himself a taxable dividend. This
entry is intended to identify the fact that to the
extent that it be ultimately determined that all or
any part of the findings of the Internal Revenue
Dept. be correct that said retention by the decedent
Ben Haimovitz was in fact an act not supported by
corporate authority and did create an obligation
payable on the part of the said decedent to the
Belmont Lumber Co.
"8. Suspense
53,985.34
To Estate of Ben Haimovitz
53,985.34
To credit the account of the Estate of Ben Haimo-
vitz with certain cash advances and transfer of note
receivable equities of the Estate said advances being
originally credited to the suspense account."
*320 There has never been an accounting to Belmont by either Ben or his estate for the rentals and proceeds from sales of property which Ben handled and for building materials withdrawn for his personal use from Belmont during the years in question except the alleged claim in the amount of $127,591.01 filed against Ben's estate. The deficiencies in income taxes and 25 per cent delinquency penalty determined to be due from Ben's estate for 1944 through 1946 and for the taxable period January 1 through March 7, 1947, have not been paid. During the years in which Ben was actively engaged in the real estate business he had transactions involving some 1,500 different parcels of real estate. The records which Ben maintained of his financial transactions were incomplete and fragmentary. Ben's records of receipts on contracts and mortgages were such that it was often impossible for Townley to determine what property was involved or what type of transaction gave rise to the entry. Due to the incompleteness or absence of Ben's records, it was often necessary for Townley to estimate the value of materials which Ben had withdrawn from Belmont for the construction of houses on property which either *321 he or Lillian owned. To determine in what year houses were constructed by Ben, it was often necessary, where there were no available records of Ben's, to refer to the real estate sales contracts, Ben's rent records, or the assessment records of Hillsborough County, Florida. Opinion The factual background of these controversies is involved and the issues somewhat complicated. Respondent's brief summarizes the situation as follows: "Ben is an individual who resided in Tampa, Florida, with his wife Lillian. They had three children by the names of Florence, Ethel, and Paul. Lillian died on February 18, 1946, and Paul is the former administrator of her estate. Ben died on March 2, 1947, and Paul and Herman, Florence's husband, are the administrators of his estate. Ben settled in Tampa in 1903 where he entered the real estate business. This was his sole activity until 1926 when he acquired the assets of a defunct lumber company which he operated as a sole proprietorship until 1932. In 1932 Ben caused Belmont to be incorporated to take over and operate this lumber business. All of Belmont's initial assets were transferred to it by Ben. "In October 1942, the respondent commenced an *322 investigation of the returns filed by Belmont for the fiscal years ended September 30, 1939, 1940 and 1941. From this investigation, it was discovered that no cash account was maintained on Belmont's books of account or a bank account maintained in its name. Also, it was discovered that the only account on Belmont's books which disclosed the receipt or disbursement of cash was Ben's personal account and that all of Belmont's cash receipts were turned over to Ben which he deposited in his personal account. Consequently, the respondent's examination was extended to cover all of the returns filed by Belmont for the fiscal years ended September 30, 1933 to September 30, 1943, inclusive, the individual returns of Ben for the taxable years 1933 to 1943, inclusive, and the individual returns of Lillian for the taxable years 1939, 1940, 1941 and 1943. As a result of this investigation the respondent determined that Belmont had deficiencies in income taxes and 50% penalty in the total amounts of $24,498.29 and $12,247.17, respectively; that Ben had deficiencies in income taxes and 50% fraud penalty in the total amounts of $148,769.11 and $74,323.43, respectively; and, that Lillian had deficiencies *323 in income taxes in the total amount of $69,591.20. None of these taxpayers petitioned this Court and the taxes and penalties so determined were ultimately assessed on November 15, 1946. Belmont paid this assessment, filed claims for refund and instituted suit for refund in the United States District Court for the Southern District of Florida. The [deficiencies determined] against Ben and Lillian have never been paid. Still later, the respondent's investigation was extended to cover Belmont's returns for the fiscal years ended September 30, 1944 to September 30, 1947, inclusive, the individual returns of Ben for the taxable years 1944 to 1946, inclusive, the individual returns of Lillian for the taxable years 1944 and 1945, and the fiduciary return of the Estate of Ben Haimovitz, Deceased, for the taxable period March 7, 1947 to December 31, 1947. Insofar as material for present purposes, the respondent determined that there were deficiencies in income taxes and 25% penalty due from Ben's estate for these years and the taxable period ended March 7, 1947, in the total amounts of $74,611.95 and $20,450.58, respectively, and that there were deficiencies in income taxes and 25% penalty *324 due from Lillian's estate for these years and for the taxable period ended February 18, 1946, in the total amounts of $32,738.05 and $8,705.08, respectively. These [deficiencies] have likewise not been paid. "With the exception of Docket Nos. 30453, 30454 and 30455, these proceedings involve basically the liability of the several petitioners as transferees of the assets of Ben and Lillian, for the deficiencies in taxes and penalties due from them respectively for all of the above enumerated years (or periods). In addition, Docket No. 30447 also involves the liability of Paul as fiduciary of the assets of Lillian's estate for the taxes and penalty due from her for the taxable years 1944 and 1945, and the taxable period ended February 18, 1946, and Docket Nos. 15937, 15940, 30440 and 30448 also involve the liability of Paul and Herman as fiduciaries of the assets of Ben's estate for the taxes and penalties due from him for all of the years in question. In all, some 60 issues are raised by the petitions, however, due to the various concessions and agreements made by the parties, 39 remain for the Court's decision. * * *" I. For convenience, we consider first the issue of fraud. *325 Respondent, having determined fraud penalties against Ben for the years 1933 through 1943, concedes that the years 1933 through 1939 are barred by the statute of limitations if the evidence fails to establish that the returns for those years were false or fraudulent with an intent to evade tax. For this evidence, he relies mainly upon understatements of income. There is little doubt that Ben understated some items of income in each of the years. The stipulation shows, for example, that interest income was understated in each year except 1939 and 1941, when it was overstated, and that salary income was understated in four of the years. The largest item, however, which constitutes the basis for the understatements arises from Ben's recurrent sales of real estate. He sold real estate on his own behalf during each of these years, but it was not until 1941 that significant evidence of such sales appeared in his returns. In that year he stated, as a footnote to his return of the sales: "I have used as the selling price the unpaid balance at the date of conveyance of the deeds. Previous payments received have been reported as rent income." There is no evidence of the basis of these properties *326 nor of the nature of the sales themselves prior to 1939. They may have been completed cash sales or deferred payment sales. If they were the latter, as petitioners contend, Ben's apparent failure to report receipts prior to his recovery of basis would be no more than consistent adherence to what he may have understood to be the proper method for cash basis reporting. We have found as facts, at respondent's request, that Ben's records were incomplete and fragmentary; that they were such that respondent's agents were often unable to identify the size and nature of the transactions creating the alleged income, and that the withdrawals of materials were based on estimates of the examining agent made many years later. To an extent, Ben may have been faced with the same problem. He was on a cash basis and his receipts were derived not only from his own extensive activities but also from the intertwined activities of Belmont, for which he acted as cash repository. We know that he overstated his rent income, at least in part, by including in his own returns the rent income collected on behalf of Belmont. But we have no way of determining from this record whether additional overstatements *327 prior to 1939 may not also have been due to his inclusion of these collections in rent income as he claimed in his 1941 return to have done. We have no evidence of the amount collected on specific sales during those years. Ben is dead and his testimony unavailable. Understatements under these circumstances are not convincing evidence of fraud. See L. Glenn Switzer, 20 T.C. 759. Ben also collected other cash receipts on behalf of Belmont and withdrew building materials from Belmont which he then used for his own real estate purposes. Neither of these items is reflected in his returns, but again explanations other than an intent to evade taxes are consistent with the facts. As to the cash items, we know that he collected all cash receipts on behalf of Belmont, but we also know that as a corollary he made payments on its behalf. Whether the result of these transactions was a net gain to Ben does not appear in the record, and although this is detrimental to petitioners in resisting the deficiency determinations it is equally detrimental to respondent in establishing a predicate for fraud. similarly, Ben's withdrawals of building material from Belmont while now properly *328 conceded to have been income to him are not so clearcut as to evidence fraud. Another origin of apparent understatement is the profit attributed to Ben on his transfer of real property to Belmont. But respondent himself apparently takes the position now that this was a nontaxable transaction under section 112(b)(5), Internal Revenue Code of 1939. Much of the information on which the deficiencies are based was obtained from records which Ben possessed, but denied having, prior to his receipt of respondent's preliminary report. Respondent relies upon this as evidence of Ben's determination not to permit too close an examination of his affairs. Cf. Morris Lipsitz, 21 T.C. 917, affd. (C.A. 4) 220 Fed. (2d) 871, certiorari denied 350 U.S. 845. But Ben's willing assistance in other instances precludes us from basing thereon any finding of lack of cooperation and suggests that his denial was not based on an unwillingness to permit the taxing authorities to learn the true facts. He did not attempt, as shown by the rider attached to his 1943 return, to make a complete report of his income for that year. He stated, in effect, that his affairs were *329 subject to an Internal Revenue audit at that time, he did not know how to report many of his receipts, and when the audit was complete he would file an amended return. To read this, as respondent suggests, as evidence of Ben's intent to evade taxes is anything but justified, for, although it is an almost certain method of establishing a deficiency, the complete explanation found in the return belies any intention of fraudulently evading taxes. Finally, respondent argues that Ben's failure to contest the deficiencies once he had received the deficiency notice establishes a prima facie case that the penalties are due. He cites no authority for this position, and it is not even clear that Ben's time for contesting the determinations had expired. Suffice it to say that the present action was timely filed and the issue is properly presented to the Tax Court for determination. On these facts we cannot say that respondent has sustained his burden of proving fraud and it follows that the statute of limitations bars the years 1933 through 1939. II. Although petitioners have raised a statute of limitations issue as to Ben for years later than 1939, our findings dispose of 1940, 1941 and *330 1943. The first two are not barred as a result of the execution of consent agreements, permitting respondent to determine the deficiencies within the period in which the notices were actually sent, see Aura Grimes Bales, 22 T.C. 355, and the latter because the operative dates demonstrate that the notice was sent within the 3-year period permitted by the statute. As to 1942, respondent's action is predicated upon the applicability of the 5-year statute of limitations (section 275(c), I.R.C. of 1939) because of his contention that there was an understatement of income for that year in excess of 25 per cent. The various adjustments to which the income originally determined will be subjected as a result of the dispositions in the remaining portion of this opinion will determine whether that position is correct. At the present it is impractical to make the necessary computations but we see no reason why the matter cannot be handled in the recomputation under Rule 50. III. Notwithstanding that the original taxpayers did not contest the deficiencies determined against them, petitioners *331 may raise the question here of the propriety of respondent's action, Wayne Body Corporation, 22 B.T.A. 401, and have done so. Perhaps the largest single issue on the merits is what treatment is to be accorded the sales of real property by both Ben and Lillian. The first question is what basis should be used in computing gain. We are unable to find that petitioners have carried their burden of showing any different basis for the property of either Ben or Lillian from that determined by respondent except to the extent that the basis figures have been agreed upon. Where stipulated the basis should be employed accordingly and in all other cases respondent's determination is approved. In the same connection, petitioners originally raised an issue as to whether the proceeds of the sales were ordinary income or capital gain. As to Ben, however, they now virtually concede that after the development of Tampa Overlook and Tulsa Heights began Ben at least was in the real estate business. We think the volume and continuity of transactions render this concession inevitable. Since this concession is applicable to all years subsequent to 1939 and since we have already concluded *332 that the earlier years are barred, it seems inescapable that the proceeds of the sales in the remaining years are not entitled to capital gains treatment. And in view of the absence of evidence to the contrary, we reach the same conclusion as to Lillian. The net profits from the sales should consequently be treated as ordinary income. Snell v. Commissioner, ( C.A. 5) 97 Fed. (2d) 891; Ehrman v. Commissioner, ( C.A. 9) 120 Fed. (2d) 607, certiorari denied 314 U.S. 668. The forms used for the so-called "sales" fall into one of three categories: "completed sales" which apparently may or may not have employed conventional mortgages; "agreements for deeds"; and leases with options to purchase. Concerning the first category, petitioners contend that they should be entitled to report on an installment sale basis. They concede that they made no such election but argue that, since the proceeds were reported as rental income, this has the same effect. This is a factual premise we cannot accept. There is no evidence that all proceeds were reported, as rents or in any other way. Cf. Joe W. Scales, 18 T.C. 1263, reversed per curiam (C. *333 A. 6) 211 Fed. (2d) 133. For that reason alone we are unable to sustain the contention. And where an election is required, there are reasons for insisting upon unequivocal action by taxpayers beyond those bearing upon the immediate consequences. See J. E. Rilcy Inv. Co. v. Commissioner, 311 U.S. 55. The "agreements for deeds" are said to be ruled by our decision in Nina J. Ennis, 17 T.C. 465. But we think that on this record that case is distinguishable. Arthur E. Wood, 25 T.C. - (December 14, 1955. The transaction in the Ennis case was recognized as closed and completed in the year under review but because the contract there was found not to be "freely and easily negotiable so that it readily passes from hand to hand in commerce" it was not considered to be "property (other than money) received" so that its fair market value should be included in the purchase price. Here there is affirmative and uncontradicted testimony by a witness for respondent that such instruments as those received by Ben and Lillian were readily transferable and, in fact, that whether or not Ben actually sold any of those he received, he did buy others. We conclude *334 that at least on the present facts these contracts for deeds had a fair market value and did readily pass from hand to hand in commercial dealings. The assumption that the "agreements for deeds" were worth their face value must, however, be rejected. There is testimony, also on the part of respondent's witness, that while such instruments changed hands freely in the ordinary course of commercial dealings, they did so generally at a discount of 10 per cent. The amount attributed as income to these transactions must accordingly be reduced by 10 per cent of the face value of the instrument. IV. Respondent determined that Ben received taxable dividends from Belmont to the extent that he retained money collected on its behalf and withdrew and applied to his own use building materials from its stock in trade. As a result of stipulations respondent has, where appropriate, adjusted these income items to comport with the surplus available to Belmont. Petitioners argue that dividends could be paid by Belmont, in conformity with local law, only as it had available surplus. There is no evidence as to Belmont's surplus and, as indicated, the record shows only that respondent's determination *335 was limited to Belmont's surplus. We are unable to disturb the determination on that ground. Petitioners next argue that the amount of the dividends was based upon estimates made by the examining agent, and because these estimates were revised at a later time they are not to be accepted by us. Admittedly the predicate of the determination is an estimate made by the examining agent in view of the information available to him, but the determination is no less presumptively correct because it was thus achieved. See Estate of Henry Wilson, 2 T.C. 1059, 1086; Jack Showell, 23 T.C. 495. Petitioners have offered no evidence and their failure of proof must leave respondent's actions undisturbed. Petitioners' final argument is that Ben's retention of corporate assets was an unauthorized act constituting embezzlement but not income to him, see Commissioner v. Wilcox, 327 U.S. 404, and that when Belmont was first informed of the misappropriation it filed proof of claim against Ben's estate. The record indicates, however, that Ben, although a minority stockholder of Belmont, controlled its affairs and dealt with its assets both freely and with corporate *336 approval. A corporate resolution adopted by the board of directors in August 1941 authorized Ben "to cash or otherwise negotiate checks made payable to the corporation, and handle the proceeds thereof as he may desire." In the face of such evidence it hardly lies with petitioners, many of whom were also active in Belmont's affairs, to argue successfully that they proceeded against Ben when they first learned of his retention of corporate assets. On these facts we conclude that Ben received taxable dividends in amounts determined, and adjusted, by respondent. See W. L. Kann, 18 T.C. 1032, affd. (C.A. 3) 210 Fed. (2d) 247, certiorari denied 347 U.S. 967; William C. Baird, 25 T.C. - (December 5, 1955). It follows that the alternative determination against Lillian must be disapproved. V. A number of adjustments made by respondent for years subsequent to 1939, although assigned as errors in the petitions, must be disposed of in respondent's favor in view of the absence of any proof upon which petitioners could claim to have sustained their burden. We sustain the determinations in these respects without the necessity of further discussion. Among *337 the adjustments which it is necessary to treat in this manner is respondent's computation of the gains on the sales of property attributed to Ben and Lillian. A portion of the sales was made by means of leases with options to purchase which respondent virtually concedes are not taxable as sales or exchanges since they do not constitute closed transactions. See Commissioner v. Union Pac. R. Co., ( C.A. 2) 86 Fed. (2d) 637. It is respondent's position that the burden imposed upon petitioners to show what proportions were completed sales and what were no more than leases has not been carried. With this contention we are unable to agree. The record contains and our findings show an allocation which, although derived from testimony of a witness produced by respondent, may, nevertheless, be availed of by petitioners to support their case. Cf. L. Schepp Co., 25 B.T.A. 419, 440. We are sustaining respondent's determination because even if the specified portion of the transactions was not taxable as sales or exchanges, the proceeds would presumably be rental income which is likewise taxable as ordinary income. To the extent that such income was received, the transaction *338 was closed as clearly as though the proceeds had been derived from a completed sale. There is nothing in the record from which we may determine that rents were not received in this fashion and, in fact, the implication is that Ben frequently treated the proceeds of his real estate dealings as "rents." Under the circumstances we see no alternative but to sustain the ultimate determination of taxable income resulting from the deficiency notice and the subsequent stipulations. VI. Of the 25 per cent delinquency penalties determined against Ben and Lillian, the only ones that remain in issue are those against Lillian for the taxable period January 1 through February 18, 1946 and those against Ben for the taxable period January 1 through March 2, 1947. There is little doubt, indeed no contrary suggestion by the parties, that both taxpayers were required to file returns for the short taxable periods. No return was filed by Lillian and the only return which might be considered as having been filed by Ben was a fiduciary return by his estate. The latter return contains a statement that a short period return should have been filed, that the income received during the short period is included *339 in the fiduciary return and that the incorrect procedure was adopted because of the audit then being conducted. The only question remaining is whether the failure of Ben and Lillian to file proper returns was due to reasonable cause rather than willful neglect. No evidence nor valid argument has been advanced by petitioners to show the failure was due to reasonable cause. The arguments that difficult factual and legal determinations precluded accurate estimate of tax positions and that Ben and Lillian depended upon their accountant for tax advice are unsupportable; the first, because it is contrary to unqualified statutory requirements, the second, because there has been no showing of advice by or reliance upon their accountant who, in fact, acknowledged that short period returns should have been filed. See Leo Sanders, 21 T.C. 1012, 1019, affd. (C.A. 10) 225 Fed. (2d) 629. We conclude that the delinquency penalties were properly imposed. VII. Transferee liability for Ben's deficiencies is contended for against Paul, Ethel and Florence. Respondent directly acknowledges his responsibility for proving the insolvency of the transferor and says, for example, *340 "In order to sustain his burden, it is essential that the respondent establish by the evidence that the transferor, while having unpaid deficiencies in taxes and penalties, transferred certain assets to the transferee and that such transfers either rendered him insolvent or were made at a time when he was already insolvent. Bennett E. Meyers ( 1953) 21 T.C. 331." [Italics added.] Although notwithstanding this statement respondent's brief also "submits that the question of Ben's solvency * * * may, perhaps, be immaterial" and cites Louise Noell, 22 T.C. 1035, it is difficult to reconcile this contention with the previous statement. Be that as it may, the most that could be said would be that the burden of proving solvency was shifted to the transferees. See Weathersbee v. Dekle, 107 Fla. 517, 145 So. 198. A comparison of the reduced deficiencies with the stipulated value of the property retained by Ben under the original transfers to Realty and his children demonstrates that he was not insolvent even after those transfers were made. If there was a *341 burden, it was therefore discharged. Recognizing that Ben's financial condition deteriorated, respondent insists that if the last transfers rendered him insolvent, we may impute that condition throughout. See Borall Corporation v. Commissioner, ( C.A. 2) 167 Fed. (2d) 865; Botz v. Helvering, ( C.A. 8) 134 Fed. (2d) 538; United States v. W. T. Price, Inc., ( S.D., Fla.) - Fed. Supp. -. These cases all involved a series of distributions in corporate liquidations. Whether a similar rule should be applied in the case of an individual where no planned or integrated transfers have been shown we need not decide. Ben was apparently not rendered insolvent even by all the transfers prior to those to Belmont in 1947. The latter were made at a time and for reasons which, at least superficially, remove them from any connection with the prior assignments. If Ben was not already insolvent, we do not think the present record justifies regarding the last transfers as part of a single transaction including the earlier ones, cf. W. Cleve Stockes, 22 T.C. 415, 429, nor imputing transferee liability on the strength of the earlier payments alone. VIII. Respondent's *342 assertion of Belmont's transferee liability, however, is based on the transfer to Belmont of a series of cash payments ostensibly in discharge of a supposed liability which Ben owed for funds and materials withdrawn from Belmont without authority. As already appears, we have concluded that no such obligation to repay existed on Ben's part and the asserted consideration for the transfers accordingly disappears. As to this situation, moreover, although the payments were actually made in several installments, they were so evidently "a series of intimately connected transactions," Botz v. Helvering, supra, as to be in effect parts of a single transfer. Whether Ben thereupon became insolvent should hence be tested by his condition when the series of payments have been completed. As nearly as the taxes and interest due from Ben can now be computed, it appears that upon the final action in this integrated assignment Ben had become insolvent. We have so found as a fact. At that time his assets have been shown to be not more than $123,327.64. If upon the recomputation of the tax in the proceedings under Rule 50 it develops that the tax and interest owed by him when these transfers *343 were completed are less than this figure, Belmont's transferee liability may be reargued in connection with the Rule 50 computation. It follows even more clearly that Ben's estate was insolvent since it acquired no assets that Ben had not possessed and owed all the taxes that he owed. By a parity of reasoning, therefore the gratuitous transfer by the estate of approximately $15,000 to Belmont renders Belmont liable as a transferee to that extent also. IX. Respondent determined transferee liability of Paul, Ethel and Florence with respect to the assets of Lillian's estate. The allegations and admissions in the pleadings establish that Paul, Ethel and Florence each received as distributions from Lillian's estate 15, 14, and 14 shares, respectively, of Belmont stock and that Lillian's estate was insolvent after these and the remaining distributions. The parties stipulated the fair market value of Belmont stock at the date of distribution to be $1,000 per share. The remaining property in Lillian's estate was appraised at $6,597.07, and Paul, Ethel and Florence each acknowledged distribution of one-fourth of this property. The value of this one-fourth interest, $1,649.27, added in each *344 case to the value of the shares of stock received equals the total value of assets transferred to Paul, Ethel and Florence. These amounts are, respectively, $16,649.27, $15,649.27, and $15,649.27, and represent the liability of these transferees for deficiencies owed by Lillian and her estate. X. Respondent claims against Paul as administrator of Lillian's estate, and against Paul and Herman as administrators of Ben's estate, the personal fiduciary liability which is created by section 3467, Revised Statutes, as amended by 48 Stat. 760, [3] and enforced in the manner prescribed by section 311(a)(2) of the Internal Revenue Code of 1939. Respondent has shown, with respect to the estates of both Ben and Lillian, that the assets were insufficient to pay all debts and that these fiduciaries discharged other debts without first paying, or making provision for the payment of, the known claims of the United States. Neither petitioner has advanced any reason why respondent's action should not be approved. There is no suggestion, still less any evidence, that their conduct constituted an exception to the priority established by section 3466, Revised Statutes, and we accordingly sustain respondent *345 in charging both Paul and Herman with personal liability as fiduciaries. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Ethel Hamovitz Krieger, Docket Nos. 15930, 15938, 30420, 30421; Florence Haimovitz Rosenberg, Docket Nos. 15931, 15939, 30441, 30442; Paul Haimovitz, Docket Nos. 15937, 30447, 30448; S. Herman Rosenberg, Docket Nos. 15940, 30440; Belmont Lumber Company, Inc., Docket Nos. 15941, 30446; Haimovitz Realty Corporation, Docket Nos. 15942, 30444; Estate of Lillian Haimovitz, Deceased, Paul Haimovitz, Administrator, Docket No. 30453; Estate of Ben Haimovitz, Deceased, Paul Haimovitz and S. Herman Rosenberg, Administrators, Docket Nos. 30454, 30455.↩
2. The deficiency notices erroneously refer to March 7, 1947.↩
*. Included labor paid by Belmont.↩
*. Not in issue.↩
*. Not in issue.↩
*. Extension granted by Commissioner.↩
3. Liability of fiduciaries Every executor, administrator, or assignee, or other person, who pays, in whole or in part, any debt due by the person or estate for whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate to the extent of such payments for the debts so due to the United States, or for so much thereof as may remain due and unpaid.↩